RAMSEY *v.* CHILD, HULSWIT & CO.

1. LIMITATION OF ACTIONS—FRAUDULENT CONCEALMENT OF RIGHTS—STATUTES—APPLICABILITY TO LAW AND EQUITY.

Act No. 314, Pub. Acts 1915, chap. 9, § 20 (3 Comp. Laws 1915, § 12330), providing that when a cause of action is fraudulently concealed from the knowledge of the party entitled thereto, the action may be commenced at any time within two years after discovery of the fraud, applies both at law and in equity, even though the cause of action is based on original fraud.

2. SAME.

Act No. 314, Pub. Acts 1915, chap. 9, § 20 (3 Comp. Laws 1915, § 12330), was intended not to curtail, but, when applicable, to enlarge, the six-year limit provided by section 13, and applies in an action at law only when it will in fact enlarge it, and hence an action at law is barred in six years from the commission of the act complained of, unless the fraudulent concealment section can be invoked to extend the time, and even then, unless brought within two years from date of discovery of the cause of action.

3. SAME.

There was no fraudulent concealment of a cause of action of fraud in the sale of the bonds so as to make available the provisions of Act No. 314, Pub. Acts 1915, chap. 9, § 20 (3 Comp. Laws 1915, § 12330), where a purchaser of bonds from a bond house did not receive interest on her coupons at the time they were due and was afterwards informed

that the enterprises were in serious financial straits, and the organization of bondholders' protective associations was urged, and the associations were perfected and she otherwise received information which should have put her on inquiry, since the statute was not designed to help those who negligently refrain from prosecuting inquiries plainly suggested by the facts known.[1]

4. SAME—CONFIDENTIAL RELATIONS—FRAUD—NOTICE.

The fact that the relation of trust and confidence exists between a purchaser of bonds and a bondhouse officer cannot impair the legal effect of notice of fraud in the sale which should have put her on inquiry so as to render available the provisions of Act No. 314, Pub. Acts 1915, chap. 9, § 20 (3 Comp. Laws 1915, § 12330).

5. SAME—PUBLIC POLICY.

Statutes of limitations are based on public policy, are vital to the welfare of society and are favored in law.

6. SAME—DELAY—BAR TO ACTION.

Mere delay extending to the statutory limit is itself a conclusive bar to the prosecution of an action.

Error to superior court of Grand Rapids; Dunham, J. Submitted June 26, 1917. (Docket No. 75.) Decided December 27, 1917.

Assumpsit by Cyanea H. Ramsey against Child, Hulswit & Company for money obtained by fraud and deceit. Judgment for defendant. Plaintiff brings error. Affirmed.

*Swarthout & Master,* for appellant.

*Butterfield & Keeney* (*Charles B. Blair,* of counsel), for appellee.

KUHN, C. J. In this case an order was made sustaining a motion to dismiss plaintiff's declaration. The action is assumpsit to recover for alleged fraud and deceit in the sale of bonds, and the motion to dismiss

---

[1]On effect of running of statute of limitations of request not to sue or agreement not to plead the statute, see notes in 63 L. R. A. 193; 16 L. R. A. (N. S.) 645.

is based upon the ground that the action, as appears from the face of the declaration, is barred by the statute of limitations.

Of the eight specific grounds alleged in the motion to dismiss, the seventh (which relates merely to matters of form) has been withdrawn from the consideration of this court by stipulation of the parties, and the remainder may be classified under two general heads, viz.:

(1) Because it appears that plaintiff paid out her money for the bonds in question more than six years before the commencement of suit, and that therefore the action is barred by the statute of limitations. Act No. 314, Pub. Acts 1915, chap. 9, § 13 (3 Comp. Laws 1915, § 12323).

(2) That the action is barred by the "fraudulent concealment section" of said statute (3 Comp. Laws 1915, § 12330) ; the claim being that the declaration discloses that plaintiff had the means of discovering and did discover her right of action, or did not use due diligence to discover it, and that the declaration does not sustain the claim that the cause of action was only discovered within six months of the date suit was brought, or at any time within two years prior thereto, nor show when or how the discovery was made, or why it was not made sooner, or that plaintiff, with ordinary care, could not have seasonably detected it, or that the concealment of the cause of action was brought about by any act of defendant, or that it prevented inquiry, but, on the contrary, shows that the defendant informed the plaintiff of all the facts on which the cause of action is based, at least as early as the year 1911.

The substance of the principal allegations of the declaration is as follows: That in the years 1909 and 1910 the defendant corporation, which represented itself to be a bank or investment bank and bond house,

with a capital of a quarter of a million dollars, and maintaining large and expensive offices in Grand Rapids, placed on the market large issues of irrigation bonds of the Denver-Greeley Valley irrigation district and the North Denver irrigation district, in the State of Colorado, and the Big Lost River Irrigation Company, in Idaho. That defendant advertised these bonds extensively and in a manner calculated to deceive unsuspecting people, and particularly women, and urged investors to establish relations of confidence with a bond house of known high standing and consult it regarding investments, in order to secure the benefit of its experience and knowledge, through the mutual confidence thus established. That plaintiff, a maiden lady, upwards of 60 years old, had certain moneys on deposit in the City Trust & Savings Bank, of Grand Rapids, of which one Hugh Blair was cashier up to May 1, 1909, when he became a director and treasurer of the defendant corporation and its agent and manager in charge of the sale of stocks, bonds, etc. That said Hugh Blair was well known and highly regarded by plaintiff by reason both of his business and his family and social connections, and that she confided in and trusted him in business matters. That immediately after his connection with defendant, Mr. Blair began a course of persuasion to induce plaintiff to invest in the bonds of said irrigation districts. That agents and bond sellers of defendant were sent to her home in a distant part of Grand Rapids, and she also began to receive large quantities of circulars and advertisements relative to defendant's irrigation bonds. That representations were made to her verbally by Blair and other officers of defendant, as well as by its bond sellers and agents, and similar representations were made through the advertising matter sent her, concerning the character of the bonds and of the security and the lands upon which they were claimed to

be a lien. These representations all were of a glowing character, and it is the claim of plaintiff that she confided in and relied upon these representations and warranties, and was thereby induced to purchase, and did purchase the following bonds:

On May 20, 1909, bond No. 3376 of the Denver-Greeley Valley irrigation district, face value $500, interest at 6 per cent., semi-annually; amount paid therefor $505.

On November 5, 1909, bond No. 1486 of the Big Lost River Irrigation Company, face value $1,000, interest 6 per cent., semi-annually; amount paid therefor $1,010.

On January 19, 1910, bond No. 1728 of the Big Lost River Irrigation Company, face value $1,000, interest 6 per cent., semi-annually; amount paid therefor $1,010.

On January 10, 1910, bond No. 1522 of the North Denver irrigation district, face value $500, interest 6 per cent., semi-annually; amount paid therefor $505.

That at the time of the making of said representations and warranties, they were untrue, false, and fraudulent, and that plaintiff, confiding in said Blair and defendant and defendant's agents, was deceived and defrauded by them.

The declaration further sets forth: That the *defendant* paid one or two of the first group of coupons maturing on plaintiff's bonds, but that the interest coupons due December 1, 1910, on the bonds of the two Colorado companies and those due January 1, 1911, on the bonds of the Idaho company were not paid when due, and though plaintiff demanded payment of same, that defendant has neglected and refused, and plaintiff has been unable to secure payment.   *   *   *
That during the six months preceding the commencement of this action, plaintiff learned that none of the irrigation projects was ever completed, the lands were never settled, the irrigation works never constructed, no farmers were living on the lands to pay taxes and none could be collected, the projects were bankrupt and

out of business, and that the bonds and interest thereon were entirely worthless.   Further, that the lands and works were not free from prior liens, but subject to prior mortgages amounting to upwards of $1,000,-000, on which default had been made and foreclosure threatened, and that there were claims for construction liens, amounting to $1,000,000, on which foreclosure proceedings had been instituted.

After stating that, until the early part of 1911, plaintiff had no intimation that said bonds or the interest would not be promptly paid according to their terms, the declaration sets out a series of notifications by defendant and others to plaintiff, beginning in the early part of 1911, which admitted the serious difficulties in which the irrigation project then found itself by reason of financial and other troubles on the part of the great irrigation systems on which the districts covered by these bonds depended for water supply, and urged the organization of "bondholders' protective committees" in connection with both the Colorado and Idaho enterprises, and after such organization was effected, further communications from defendant and from the committees (of one of which Ralph S. Child, vice president and director of defendant, was a member) urged plaintiff to deposit her bonds with said committees, assuring plaintiff that work already done "removes all probability of complete failure of the project;" that plaintiff did deposit her Idaho bonds, the deposit being made with the defendant, and her receipt therefor being signed by Child, vice president; that the committees asked for funds to complete the project, held out the hope that the principal of the bonds and possibly some of the interest could be saved, and one communication from the Chicago Title & Trust Company assured plaintiff "that the only penalty to be suffered by those who are unable to protect their present investment by taking some of the new bonds is the

loss of interest on their present bonds until after January 1, 1914;" that plaintiff accepted as true the statements and advice of Blair to her during 1911, as she alleges, up to the time in said year when he left Grand Rapids to take up a permanent residence in California, to the effect that the companies would soon pay their interest, and that she relied on his statements and was thereby lulled to sleep and did not take other counsel or advice nor make investigation of the complicated matters and explanations contained in the communications received by her, and never understood the meaning of same nor the status of the irrigation matters until within the six months immediately preceding suit, when she learned that all of the projects had failed and her bonds were worthless. The theory of the declaration is stated to be that the formation of the bondholders' protective committees and the procedure taken was designed to prevent plaintiff from investigating the complicated situation, and further that the whole scheme was devised by defendant and Trowbridge & Niver Company and others "for the purpose of foisting these spurious issues of bonds on the unsuspecting public;" that the bondholders' protective agreements were a part and a continuance of the fraud, devised to keep the bondholders from bringing suits, and that this conduct has worked an estoppel against defendant, preventing it from pleading the statute of limitations, and has given to the original fraud and deceit a continuing character whereby defendant is deprived of the protection of the statute prior to the discovery of the fraud by plaintiff, which she claims occurred within the six months immediately preceding suit.

A second and third count are added to the declaration, the only variation in which that appears to call for special consideration as bearing on the questions involved in the motion to dismiss is that they allege in

the alternative that defendant *warranted* the bonds and their securities and the conditions surrounding the issuance. These are followed by the common counts, and a bill of particulars was filed showing the exact dates of the plaintiff's purchases of bonds and the dates and amounts of unpaid interest installments.

After a hearing of the motion to dismiss, the court below filed a finding that the motion must be granted and entered an order giving plaintiff leave to amend her declaration within 15 days, in default whereof the declaration to be dismissed. After the expiration of the 15 days, plaintiff having failed to amend her declaration, final judgment was entered dismissing the suit.

The question before us depends for its solution chiefly upon the construction to be placed upon the Michigan statute of limitations. The gravamen of plaintiff's action is that she was induced by the defendant to purchase the four bonds in question through certain alleged false and fraudulent representations. The first of said bonds was bought on May 20, 1909, and the last one January 19, 1910, and this suit was commenced October 7, 1916. Section 13 of chapter 9 of the judicature act (Act No. 314, Pub. Acts 1915, 3 Comp. Laws 1915, § 12323) is as follows:

"All actions in any of the courts of this State shall be commenced within six years next after the causes of action shall accrue, and not afterward, except as hereinafter specified."

Under the ordinary rule, plaintiff's cause of action accrued upon the purchase of the bonds, and if this section governs, clearly her action is barred.

The learned counsel for the appellant, however, have argued at some length, and cited many authorities claimed to sustain their position, that where fraud is charged as the foundation of a suit, the statute of limitations begins to run, not from the date of the commission of the fraud, but from the time the fraud is

discovered. The question when the statute begins to run in such cases is one as to which there has been much confusion and conflict of authority. The strict rule formerly obtaining in courts of law was that in all such cases the statute began to run from the time when the fraud was perpetrated. But it has long been the rule in equity that where relief is sought from a *fraud concealed from the complainant,* being himself free from neglect or fault in failing to discover the fraud, the statute begins to run from the time the fraud is discovered. In the absence of such concealment, however, equity usually followed the same rule as courts of law, and indeed some courts of equity applied the rule at law even to cases of concealed fraud, when the fraud was discovered a reasonable time before the expiration of the statutory period from the date of the fraudulent act. On the other hand, courts of law in a number of jurisdictions began to show a tendency to adopt the equitable rule, and early decisions may be found in both State and Federal courts to the effect that a replication of concealed fraud is a good answer to a plea of the statute of limitations. This doctrine, however, was by no means universal. As a result of the conflicting decisions, many of the States undertook to settle the question in their respective jurisdictions by statute, and the equitable rule above referred to has been embodied, in varying form and with greater or less scope of application, in the statutes of many of the States, most of which make the rule applicable at law as well as in equity. Michigan has long had such a provision, which, in its present form, appears as section 20 of chapter 9 of the judicature act (3 Comp. Laws 1915, § 12330) and is as follows:

"If any person who is liable to any of the actions mentioned in this chapter, shall fraudulently conceal the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at

any time within two years after the person who is entitled to bring the same shall discover that he had such cause of action, although such action would be otherwise barred by the provisions of this chapter."

This statute applies both at law and in equity. It will be observed that the legislature did not see fit to adopt the equitable rule to the full extent of allowing the six-year limitation period to be considered as beginning at the date of discovery of the cause of action, but chose rather to allow a period of two years from date of such discovery within which to bring suit, as a special right, when by the strict terms of the general rule the action would be barred before the expiration of such two-year period. Under the two sections above quoted, a plaintiff now has, in any case, the full period of six years from the date of the fraudulent act, or other act creating his cause of action, within which to institute suit, and moreover, where the defendant has fraudulently concealed from him his cause of action, he has, under any circumstances, not less than the full period of two years from date of discovery in which to bring his action.

The latter section of the statute was intended not to curtail, but, when applicable, to enlarge, the time for action limited by the former, and it applies only where it will in fact enlarge it. Without attempting to discuss what may still be the inherent power of a court of equity in Michigan *in exceptional cases* to go beyond the terms of the statute, even as modified, and on equitable grounds to grant additional relief, it is certain that in a suit at law the statutory provisions govern and an action such as the present is barred in six years from the commission of the act complained of, unless the fraudulent concealment section can be invoked to extend the time, and even then, unless brought within two years from date of discovery of the cause of action.

Counsel for appellant insist that section 20 does not

apply to cases where *fraud is the ground of action,* but only where some *other cause of action has been fraudulently concealed,* and that therefore in actions based on original fraud the equitable rule allowing six years from date of discovery of the fraud applies. It is a sufficient answer to this contention to say that this court has consistently applied the rule of section 20 to cases where fraud is the ground of action (see *Tompkins* v. *Hollister,* 60 Mich. 470 [27 N. W. 651] ; *Stebbins* v. *Patterson,* 108 Mich. 537 [66 N. W. 484] ; *Allen* v. *Conklin,* 112 Mich. 74 [70 N. W. 339] ; also *Purdon* v. *Seligman,* 78 Mich. 132 [43 N. W. 1045] ; *First Nat. Bank of Ovid* v. *Steel,* 146 Mich. 308 [109 N. W. 423], as have also the courts of other States in the application of similar statutes (see *Walker* v. *Soule,* 138 Mass. 570; *Brackett* v. *Perry,* 201 Mass. 502 [87 N. E. 903] ; also *Wood* v. *Carpenter,* 101 U. S. 135 [Indiana statute]).

But appellant further claims that her declaration does in fact show a fraudulent concealment from her of her cause of action until within six months prior to the commencement of suit, and that if section 20 does apply, her action is saved thereby. In support of this claim counsel insist: *First,* that where fraud is the *gravamen* of the action, mere silence will toll the statute; and, *secondly,* that the alleged payment by defendant of the first group of coupons on the bonds, the subsequent correspondence leading to the formation of the bondholders' protective committees and the proceedings and communications of said committees, together with the advice and explanations of defendant through Mr. Hugh Blair and others, were acts amounting to a fraudulent concealment from plaintiff of her cause of action. Under our view of the law above announced, it is unnecessary to discuss the effect of the payment of the first interest coupons, because both the period of six years from the purchase of the bonds and the period of two years from the first default in

payment of interest had expired before this suit was begun, and plaintiff's action would be barred under the provisions of either section. An analysis of the notifications and proceedings relative to the bondholders' protective committees does not impress us that they were designed, or could have had the effect to *conceal* the cause of action, but rather to *reveal* it. The effort seems to have been to induce plaintiff, notwithstanding the ground for action revealed, to hold to her investment and take her chances in the ultimate outcome. This is by no means concealment. In view of the condition of affairs disclosed by the communications received by plaintiff beginning in the early part of 1911, even the statement in the letter of the Chicago Title & Trust Company of May 29, 1911, that "the only penalty to be suffered by those who are unable to protect their present investments by taking some of the new bonds is the loss of interest on their present bonds until after January 1, 1914," and the assurance claimed to have been given her by Hugh Blair in 1911 that "the companies would soon pay their interest" (upon which statements considerable stress has been laid), cannot reasonably be held to amount to a concealment of the fact that the original representations were untrue. To assure her that her loss would be small certainly does not tend to conceal the fact that the prior positive representations as to the absolute security of the bonds were false. We think the disclosures made to plaintiff in 1911, as set forth in the declaration, coupled with failure to receive the interest due on her bonds in December, 1910, and January, 1911, to say the least, should have put her upon diligent inquiry.

"The statute was not designed to help those who negligently refrain from prosecuting inquiries plainly suggested by facts known." *First Nat. Bank of Ovid* v. *Steel*, 146 Mich. 308 (109 N. W. 423) ; citing *Purdon* v. *Seligman*, 78 Mich. 132 (43 N. W. 1045).

Appellant's counsel raise the further point that the declaration shows a relation of trust and confidence between plaintiff and defendant; that there was accordingly a duty resting upon defendant to disclose the true state of facts to plaintiff; and that in such case mere silence, unaccompanied by any affirmative act of concealment, will prevent the running of the statute until discovery. It is true this court has taken a liberal view as to what constitutes a relation of trust and confidence in such cases. *Tompkins* v. *Hollister*, 60 Mich. 470 (27 N. W. 651); *Comfort* v. *Robinson*, 155 Mich. 143 (118 N. W. 943). There is also some authority for holding, under certain circumstances, that such a relation may exist with a corporation because of a special trust and confidence in an officer thereof. But under the circumstances of this case, we do not see how the establishment of such a relation can alter the result. It is not here a mere case of silence when there was a duty to disclose. We have already held that plaintiff had actual notice of the fraud, or at least such information as should have put her on active and earnest inquiry, and we do not think that the relation of confidence claimed in the declaration can be held to impair the legal effect of that notice. There were no such special circumstances as were present in the case of *Comfort* v. *Robinson, supra,* and the situation is not analogous.

We do not think there is merit in the contentions of the counsel for appellant as to the effect of the allegations of warranties made in the declaration. A careful consideration of this aspect of the pleading fails to disclose anything that can be fairly construed as a valid warranty *in futuro*, as to which a cause of action accrued within the limits of the statutory period. Nor has any explanation been advanced as to the case intended to be set forth in the common counts attached to plaintiff's declaration that seems to present any

meritorious reason why the order dismissing the declaration should not be sustained.

While regretting the situation in which appellant now finds herself, we cannot escape the conclusion that Miss Ramsey, if not with positive knowledge of the falsity of the representations which she claims induced her to make her unfortunate investment, at least with an abundance of information which should have led to a prompt investigation, slept on her rights and chose rather to await the results of the efforts of the committees to save for the bondholders at least a portion of the face of their bonds; and that having been disappointed in the outcome of the course she elected to pursue, she now brings a belated action and seeks to induce the court to relieve her from the situation in which she finds herself by her own negligence. We think the attitude of the courts on this subject is well expressed in the following language of Justice Swayne of the Supreme Court of the United States in the case of *Wood* v. *Carpenter,* 101 U. S. 135:

"Statutes of limitations are vital to the welfare of society and are favored in the law. They are found and approved in all systems of enlightened jurisprudence. They promote repose by giving security and stability to human affairs. An important public policy lies at their foundation. They stimulate to activity and punish negligence. While time is constantly destroying the evidence of rights, they supply its place by a presumption which renders proof unnecessary. Mere delay extending to the limit prescribed is itself a conclusive bar. The bane and antidote go together."

Under our view of the law as above stated, we are unable to find that plaintiff's declaration sets forth any cause of action that is not barred by the statute of limitations, and the judgment must therefore be affirmed, with costs to the appellee.

STONE, OSTRANDER, BIRD, MOORE, STEERE, BROOKE, and FELLOWS, JJ., concurred.