**In re James J. HUNT and Kelly L. Hunt, Debtors.**

**Home Acres Building Supply Co., Plaintiff,**

v.

**James J. Hunt and Kelly L. Hunt, Defendants.**

**Bankruptcy No. SG 05–18087. Adversary No. 06–80095.**

United States Bankruptcy Court, W.D. Michigan.

Oct. 31, 2006.

James M. Keller, Keller, Vincent and Almassian PLC, Grand Rapids, MI, for Debtors.

## OPINION

JO ANN C. STEVENSON, Chief Judge.

This matter comes before the court upon a Complaint filed by Home Acres Building

Supply Co. (Home Acres) to determine the dischargeability of a debt pursuant to 11 U.S.C. § 523(a)(4). In response, the Defendants filed a Motion for Summary Judgment.

Presented in this adversary proceeding are claims that arise in a case referred to this court by the Standing Order of Reference entered by the United States District Court for the Western District of Michigan on July 24, 1984. This court has jurisdiction over this case pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Accordingly, the bankruptcy court is authorized to enter a final judgment subject to those appeal rights afforded by 28 U.S.C. § 158 and Fed. R. Bankr.P. 8001 et. seq.

The following constitutes the court's findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052. In reaching its determinations, this court has considered the parties' oral arguments, briefs and motions.

### Background

James and Kelly Hunt (Hunts or Defendants) and Todd and Cathleen Hoppough incorporated Hunt–Hoppough Custom Crafted Structures, Inc. (HHCC) on May 7, 2004. HHCC manufactured modular homes and modular office spaces. Home Acres was a material supplier of the inventory from which the modular structures were manufactured. The homes were then sold to dealers who would place them onto real property.

On November 2, 2004, Home Acres and HHCC entered into a contract for the sale of building materials which were used by HHCC on one or more building construction projects. After completion, HHCC was paid. Rather than paying Home Acres,

the funds were used to pay expenses unrelated to the building projects.

HHCC became insolvent and filed Chapter 11 bankruptcy on July 20, 2005. When it became apparent to the Hunts that the plan of reorganization for HHCC was not feasible, they resigned as officers and shareholders of the company and also filed bankruptcy.

The HHCC bankruptcy case was converted to Chapter 7 on April 9, 2006. Home Acres filed an adversary proceeding against the Hunts on January 19, 2006 alleging defalcation while acting in a fiduciary capacity pursuant to 11 U.S.C. § 523(a)(4).

Home Acres argues that the Michigan Builders Contract Fund Act (MBCFA) applies to the Debtors because HHCC, as part of the industry, was a contractor engaged in the building construction business. Consequently, the corporate officer in charge of determining who is paid from MBCFA trust funds would be guilty of defalcation if he misappropriated those funds.[1]

The Debtors first argue that they were not personally liable on the debt. They also contend that HHCC was not a contractor, and the goods were not bought from Home Acres for use on specific building projects. Consequently, there were no "building contract funds" involved. Finally, the Debtors assert that the MBCFA applies only to contractors in the building construction industry while HHCC was a manufacturer that assembled products in a factory and had its own separate set of regulations under which it was required to operate.

### Summary Judgment Standard

Summary Judgment is appropriate if there is no genuine issue of material fact

---

1. See *In re Johnson,* 691 F.2d 249 (6th Cir. 1982); *In re Kriegish,* 275 B.R. 838 (E.D.Mich.2002); *In re Kofsky,* 2006 WL 2707188 (Bankr.S.D.N.Y.);

and the moving party is entitled to judgment as a matter of law. Fed. R. Bankr.P. 7056. The summary judgment rule requires that the disputed facts be material, that is, facts which are defined by substantive law and are necessary to apply the law. The rule also requires that the dispute be genuine, that is if a reasonable jury could return a judgment for the non-moving party. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). "Only disputes over the facts that might affect the outcome of the suit under the governing law will preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must draw all inferences in a light most favorable to the non-moving party, but the court may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992)(quoting *Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

### The Michigan Builders Contract Fund Act

The MBCFA applies to those funds paid to contractors and subcontractors for products and services provided under construction contracts. It states in pertinent part:

> Section 1. In the building construction industry, the building contract fund paid by any person to a contractor, or by such person or contractor, or by such person or contractor to a subcontractor, shall be considered by this act to be a trust fund, for the benefit of the person making the payment, contractors, laborers, subcontractors or materialmen, and the contractor or subcontractor shall be considered the trustee of all funds so paid to him for building construction purposes.

> Section 2. Any contractor or subcontractor engaged in the building construction business, who, with intent to defraud, shall retain or use the proceeds or any part thereof, of any payment made to him, for any other purpose than to first pay laborers, subcontractors or materialmen, engaged by him to perform labor or furnish material for the specific improvement, shall be guilty of a felony in appropriating such funds for his own use while any amount for which he may be liable or become liable under the terms of his contract for such labor or material remains unpaid, and may be prosecuted upon the complaint of any persons so defrauded ...

> Section 3. The appropriation by a contractor, or any subcontractor, or any moneys paid to him for building operations before the payment by him of all moneys due or so to become due laborers, subcontractors, materialmen or others entitled to payment, shall be evidence of intent to defraud.

MCLA § 570.151–570.153

■ Consequently, the prima facie elements of an action brought under the MBCFA are that: 1) the defendant is a contractor or subcontractor engaged in the building construction industry; 2) someone paid the contractor or subcontractor for labor or materials provided on the construction project; 3) the defendant retained or used those funds, or any part of those funds; 4) the funds were used for a purpose other than to first pay laborers, subcontractors, and materialmen; and 5) the laborers, subcontractors, and materialmen were engaged by the defendant to

perform labor or furnish material for the specific project. *DiPonio Construction Co., Inc. v. Rosati Masonry Co., Inc.,* 246 Mich.App. 43, 631 N.W.2d 59 (2001).

### Contractors or Manufacturers

■ The Debtors contend that HHCC was nothing more than a manufacturer that assembled a product in a factory. In contrast, the Plaintiff argues that even though the terms "contractor" and "subcontractor" are not defined in the MBCFA, the Debtors were contractors within the meaning of the statute. Because the scope of the MBCFA is broad, it should be construed liberally in advancement of the intended remedy. Plaintiff claims that the statute applies to the "building construction industry;" "to any contractor or subcontractor engaged in the building construction business;" and to "building operations," and therefore should be read to encompass any activity that contributes to the erection of a building.

In addition, Plaintiff cites MCLA § 125.1519 of the construction code, which Defendants concede applies to the builders of modular structures, where some pertinent terms are defined. Those terms are:

"Construction" means the construction, erection, reconstruction, alteration, conversion, demolition, repair, moving, or equipping of buildings or structures. MCLA § 125.1502a(1)(*l* ).

"Premanufactured unit" means an assembly of materials or products intended to comprise all or part of a building or structure, and which is assembled to other than the final location of the unit of the building or structures by a repetitive process under circumstances intended to insure uniformity and quality and material content. Premanufactured unit includes a mobile home. MCLA § 125.1502a(1)(y).

### Analysis

■ In Michigan, a statute of repose was enacted in 1967 to protect licensed architects and professional engineers. It was amended in 1985 to include contractors. In this statute, the Legislature provided a definition of "contractor." It states:

As used in this section, "contractor" means an individual, corporation, partnership, or other business entity which makes an improvement to real property. MCLA § 600.5839(4)

Using the term "contractor" in this statute and looking at the intended definition of the word logically derived from the context of that use in the MBCFA, we believe the application of this definition to the MBCFA is consistent and not demonstrably at odds with legislative intent. Consequently, we shall view a contractor as any individual or business entity which makes an improvement to real property.

### A Contractor Makes Improvements to Real Property

We start by looking at the definitions of "construction" and "prefabricated unit" under the construction code. It would appear that "construction" does not include assembly, while "prefabricated units" are assembled, not constructed.

Next we look to the context of the term "make." In the construction industry, a contractor or contracting company is engaged to perform a service. This service is to "make" or create a specific structure for a certain piece of real property and to coordinate other workers to help in that creation. Until the real property is chosen nothing can be "made." But more importantly nothing can be "made" without a service being performed. In other words, when hiring a contractor, the end user is primarily buying a service.

■ Once a structure is built on real property, a contractor's end product is unique. Although there may be identical houses built by the same builder, there are never identical pieces of property. Consequently, when a contractor "makes an improvement to real property," it provides a service that becomes a unique good meant to be permanently affixed to realty.

Although something similar occurs in the modular home industry, the modular unit manufacturing company is engaged to produce a good rather than to perform a service. Moreover, the good produced is not necessarily destined to be affixed on a specific piece of real property. In most instances the modular unit is manufactured before its end location is known. It is uniform and impermanent, assembled, not constructed. It is movable, can be placed anywhere, and may never come out of the dealer's showroom. When purchased, there is no service component in the mind of the end user. It is purchased solely as a good.

### The Purpose of the MBCFA

■ "The purpose of the act is to create a trust fund for the benefit of material men and others under private construction contracts." *Weathervane Window, Inc. v. White Lake Construction Co.*, 192 Mich. App. 316, 325, 480 N.W.2d 337, 341 (1991). As such, the MBCFA, along with construction lien and mechanics lien statutes, are meant to protect the services provided by the laborers and their required materials.

The reason for this is because once a structure is made and affixed to real property, a good has been created that is worth more than the materials alone. Consequently, if a contractor is paid, and fails to pass on those payments to his laborers or materialmen, the MBCFA imposes a statutorily created trust fund with the contractor as trustee.

Under our particular set of facts, we must first ascertain which party played the various roles of contractor, subcontractor and materialmen. Only then can we accurately determine who is protected by the MBCFA and who is obligated under it.

### The Chain of Supply

■ HHCC supplied modular structures to a dealer who sold it to an end user. Accordingly, the role of contractor would be the party who performs the service of actually placing the prefabricated unit on the real property and hires others to make it habitable. This service would be performed by either the dealer, or a builder hired by the dealer.

Once the dealer has sold a modular home, it or its builder would hire workers, for example, to pour a foundation, dig a well, connect all plumbing lines, hook up the electricity, and possibly construct a porch or patio. These services would be performed by the subcontractors hired by the dealer or its builder.

To complete these projects the contractor or dealer and subcontractors would obviously require materials supplied by materialmen. In a modular home situation, the largest single item necessary to complete the job would be the prefabricated unit itself. This good would have been supplied by HHCC.

In order to manufacture these units, HHCC would also need materials. These materials were supplied by Home Acres through a purchase order. As HHCC was a materialman that supplied materials to contractors or subcontractors, it was only sheltered by the umbrella of the MBCFA, and had no trust obligations imposed by it. HHCC had no duty to pass payment on to Home Acres other than by virtue of the contract made between the parties.

Because there were no trust funds collected by HHCC, neither Mr. Hunt nor HHCC held monies specifically entrusted to them for Home Acres. As such, Home Acres holds nothing more than an unsecured claim in the HHCC bankruptcy for non-payment of the contract.